Filed 11/05/20  P. v. Driver CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058571 |
| v. | (Super. Ct. No. 19WF1134) |
| CLIFFORD ROWE DRIVER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

Defendant Clifford Rowe Driver appeals from the judgment of conviction entered after a jury found him guilty of one felony count of making criminal threats, one misdemeanor count of making criminal threats, and one misdemeanor count of brandishing a deadly weapon.  He contends the trial court abused its discretion by excluding evidence showing one victim's prior violent conduct, and the other victim's prior contacts with police.  Driver argues the trial court further abused its discretion by denying his motion to reduce his felony conviction for making criminal threats to a misdemeanor under Penal Code section 17, subdivision (b)(3).

We affirm.  The trial court did not abuse its discretion by excluding the evidence proffered by Driver or by denying his motion to reduce his felony conviction to a misdemeanor.

## FACTS

### I.

### THE MARCH 2019 INCIDENT

Around 5:00 p.m. on March 23, 2019, Charlie Orozco walked by a coffee shop on his way to work at a nearby restaurant.  Orozco made eye contact with Driver who was sitting about 20 feet away from Orozco outside the coffee shop.  Driver started yelling at Orozco:  "Fuck you, you fucking faggot.  What are you going to do."  Driver pulled out a bike lock that looked to Orozco like it weighed 10 or 12 pounds[1] and aggressively flailed it around while telling Orozco he was going to kill Orozco and there was nothing to do about it.  Orozco thought Driver was "definitely" going to hit him with the bicycle lock.

---

[1]  The bicycle lock actually weighed 3.2 pounds.

Orozco called the police and reported that Driver had yelled at him: "Come at me, I will kill you" several times and also had told Orozco, "I will fuck you up." While waiting for the police to arrive, Orozco kept an eye on Driver from a distance as Driver walked away. Orozco, who described himself as a large man, was worried that if Driver would threaten Orozco without provocation, "what else will he do to somebody else."

Driver testified that it was Orozco who, while walking by the coffee shop where Driver was seated, tried to catch Driver's attention and initiate conversation. According to Driver, when Orozco took a couple of steps toward Driver and tried to lunge at him, Driver thought he was "not going to deal with that." Driver walked over to his bicycle, retrieved his bicycle lock, sat back down with the lock on his lap, and started to drink his coffee. Driver further testified that Orozco responded, "Hey, I know what to do about this" and told Driver he was going to call the police. Driver waited around for about 10 minutes "to see if anybody is going to show up" and when no one did, he left on his bicycle. He admitted calling Orozco a faggot but denied waving the lock or threatening to kill Orozco.

## II.

### THE MAY 2019 INCIDENT

Around 2:30 p.m. on May 10, 2019, Maria Romero got off the bus at a Garden Grove bus stop after a shopping trip and crossed the street on her way home. As she walked along the sidewalk, she noticed Driver sitting on a table with benches around it. She smiled at Driver. He looked at her, stood up, turned his whole body toward her, and called her a wetback, a lesbian, and gay. He flung his arms up and flipped her off. He also told her, "I'm going to kick your ass." He was loud and appeared angry.

Romero was startled, offended, and scared. She thought Driver was going to attack her. She walked quickly across the street; Driver slowly walked toward her with his fists clenched and his middle fingers up and got within 10 feet of her.

3

Annette Thompson, who had been playing a game in a nearby park, was walking when she saw Romero waving as if she were trying to get Thompson's attention. Romero called out to Thompson and asked her to call the police because someone had been yelling at her. Romero appeared very anxious and agitated; she was shaking. Thompson called 911. Thompson heard an angry male voice yelling but could not see where the sound was coming from but noticed someone walking away from the area.

Driver testified that Romero had initiated contact that day by trying to get his attention like Orozco had. He also testified that Romero made eye contact with him; he thought she acted like this was "her opportunity to make a nuisance out of herself" and that she could "[j]ust show up and [Driver was] supposed to be proud and happy to see her." He admitted calling her a wetback and admitted flipping her off "because she kept going on and on with it" and was not going to give up. He felt harassed by Romero.

Driver denied saying anything else to Romero, and he specifically denied screaming at her or threatening that he was going to kick her ass. He also denied standing up in an aggressive manner or walking toward her but stated that instead, as usual, he minded his own business. He believed Romero was upset because he "didn't involve [him]self with her." Because Romero was hollering and screaming so loudly, Driver testified he got up and "removed [him]self from the scene" by riding away on his bicycle.

PROCEDURAL HISTORY

Driver was charged in an amended information with (1) one felony count of making criminal threats against Romero (Pen. Code, § 422, subd. (a)); (2) one misdemeanor count of making criminal threats against Orozco (*ibid*.); and (3) one

4

misdemeanor count of brandishing a deadly weapon (*id.*, § 417, subd. (a)(1)). The jury found Driver guilty as charged on all three counts.

The trial court denied Driver's request under Penal Code section 17, subdivision (b)(3) to reduce his felony conviction to a misdemeanor but granted Driver's unopposed oral motion to reduce his felony conviction to a misdemeanor once Driver had successfully completed probation. The court suspended the imposition of sentence and placed Driver on three years' formal probation on terms and conditions including that he spend 308 days in the Orange County jail. Driver appealed.

## DISCUSSION

### I.
#### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY EXCLUDING DRIVER'S PROFFERED EVIDENCE.

Citing Evidence Code sections 1103 and 780,[2] Driver contends the trial court denied his due process right to present a defense when it excluded evidence of Orozco's prior acts of violence and of Romero's prior contacts with police. We review a trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Cowan* (2010) 50 Cal.4th 401, 482; *People v. Heard* (2003) 31 Cal.4th 946, 972, 975.)

### A.
#### *Interplay of Sections 1103, 780, and 352*

Section 1103, subdivision (a) provides in relevant part: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character." Even if proffered evidence is

---

[2] All further statutory references are to the Evidence Code unless otherwise specified.

relevant and admissible under section 1103, the trial court may exclude such evidence under section 352. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456-1457.)

Section 780 provides that in determining the credibility of a witness, subject to section 352, the jury may consider any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing. (*People v. Dalton* (2019) 7 Cal.5th 166, 214.) Specifically, "[p]rior misconduct can also be admissible to impeach a witness under section 780, subdivision (i)—which applies to evidence that tends to establish '[t]he existence or nonexistence of any fact testified to by [the witness]'—by suggesting a particular aspect of the witness's testimony is untrue. [Citations.] The admission of impeachment evidence on this ground remains subject to section 352." (*People v. Turner* (2017) 13 Cal.App.5th 397, 408.)

Section 352 gives the trial court discretion to exclude evidence if its probative value "is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See *People v. Hardy* (2018) 5 Cal.5th 56, 87 ["'In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value'"].)

B.

*Proffered Evidence of Orozco's Prior Acts of Violence*

In his opening appellate brief, Driver argues the trial court erred by denying his request to impeach Orozco with evidence of his prior violent conduct to show he had been the aggressor in his encounter with Driver. During trial, Orozco testified that he had anger management problems in the past, had pleaded guilty to making criminal threats in 2012, and admitted that after he called 911 during the March 2019 incident, he provided the police officers with his mother's maiden name instead of his legal name because he

6

did not want them to learn about his criminal record which "haunts" him and causes him to feel "very ashamed."

Citing sections 1103 and 780, Driver sought to introduce evidence of details underlying Orozco's 2012 misdemeanor conviction for making criminal threats as well as his concomitant conviction for misdemeanor vandalism. Driver's trial counsel argued the following evidence regarding those convictions should have been admitted to show Orozco in March 2012 (1) had gang affiliations and a potential gang moniker, (2) became upset when he was evicted from a sober living home, (3) threatened a counselor he would put a hit on him, (4) kicked a door down, and (5) threw a lamp out of his bedroom window and a television out of the living room window. The trial court took the matter under submission to review 20 pages of police reports before ruling.

The trial court tentatively ruled that evidence of the facts underlying Orozco's misdemeanor convictions would be inadmissible under the "normal weighing process" of section 352 without prejudice to revisiting its ruling following Driver's testimony. The trial court later ruled that Orozco's moniker and the "possibility of [his] gang involvement in the past . . . has no relevance to these facts."

After Driver's testimony, the trial court confirmed its ruling that further evidence regarding Orozco's prior convictions would not be admitted. The court explained: "[A]s far as [section] 1103, the seven-year-old incident from Alhambra is long ago and very different. And [Orozco] admitted anger problems in the past. So I think the jury has some sense of him."

Driver also sought to introduce evidence of an incident that occurred in 2017 which resulted in Orozco's arrest although ultimately no charges were filed against him. A police report showed on that occasion, Orozco had been riding in a car driven by his friend who was pulled over by police officers and ultimately convicted of driving under the influence. Orozco, who also appeared to officers to be intoxicated, told police: "If you're going to take him, you will have to take me, too. I won't let him go through

7

the booking process alone." Orozco also kicked the police car, telling officers he was going to "give them a charge." After he was arrested and taken to jail, Orozco spontaneously stated: "I'm really sorry about what I had to do, but I couldn't let him go without me getting a charge. I had to make it look like I was the bad influence."

In arguing that evidence of the 2017 incident should not be admitted, the prosecutor argued: "I don't think that is analogous to what we have here; that he was somehow threatening an individual with bodily harm. That is not what happened in this case." Driver's trial counsel responded by citing a statement in the police report summarizing the incident: "Orozco became verbally aggressive with [the officers]. Orozco threatened physical violence . . . to all officers on scene and [was] ultimately arrested for Penal Code 148[, subdivision (a)]."[3]

The trial court ruled that evidence of the 2017 incident was inadmissible, stating: "I'm afraid that would be a trial within a trial. [¶] Here is a person who is drunk, who claims he is putting on an act with the cops to impress his buddy or to satisfy his buddy, to make his buddy like him. So it has several levels to it. [¶] Is he drunk? Isn't he drunk? Is he doing this to impress his buddy, or not?" The court stated it could "see some relevance" to the proffered evidence but its presentation would require an undue consumption of time, noting "we can't have another trial within a trial."

The trial court did not abuse its discretion by excluding the proffered evidence of the 2012 and 2017 incidents. Orozco directly testified that he suffered a conviction for making criminal threats in 2012 and that he had had an anger management problem. Further details regarding the 2012 incident were not significantly probative to

---

[3] Penal Code section 148, subdivision (a)(1) provides in part: "Every person who willfully resists, delays, or obstructs any public officer, [or] peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

the trial of the instant charges, particularly given its remoteness in time from and its lack of similarity to the March 2019 incident. In the 2012 incident, Orozco became angry, threatening, and destructive in response to being told he had to leave the sober living home where he had been living. At trial, Driver testified Orozco randomly attempted to simply initiate contact with him without a reason much less provocation.

The probative value of Orozco's past gang affiliations, including the possibility he had a gang-related moniker, was low as this case did not have anything to do with gangs. The probative value of that evidence was certainly substantially outweighed by the probability it would create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

Orozco was never convicted of any crime in connection with the 2017 incident and, like the 2012 incident, evidence regarding it was not particularly probative given Orozco's testimony admitting he had anger management issues and had made criminal threats in the past. Nor was the 2017 incident sufficiently similar to the instant misdemeanor charges involving Orozco to be probative.

Furthermore, the presentation of evidence regarding both the 2012 and the 2017 incidents would unquestionably have taken significant time.[4] The trial court did not abuse its discretion by concluding that under section 352 the probative value of the proffered evidence regarding those two incidents was substantially outweighed by the probability its admission would require an undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

---

[4] In his appellate briefs, Driver cites the trial court's references to the court having promised the jury the trial would end by a certain date in support of his argument the court gave undue weight to the "undue consumption of time" factor of the analysis under section 352. We have thoroughly reviewed the trial transcript and conclude the trial court applied the proper legal standards in facilitating a fair trial and did not give undue weight to the time factor in making its evidentiary rulings.

9

## C.

### *Proffered Evidence of Romero's Prior Altercations with Police*

At a pretrial hearing, the trial court stated it reviewed the "arrest reports or field contact reports" pertaining to Romero and, because the court did not find anything germane to the case or "anything of moral turpitude," ruled such evidence would be not admissible at trial. During Driver's trial counsel's cross-examination of Romero at trial, counsel asked Romero (1) whether she was a "totally peaceful" person to which she responded, "yeah;" (2) whether she ever had "bad experiences with the police" to which she responded, "no;" and (3) whether she had ever been in any prior altercations, to which she responded, "no." Driver's counsel then argued, in light of her responses, evidence of her prior police contacts had become relevant to impeach her.

Driver's counsel sought to challenge Romero's credibility under section 780[5] by introducing evidence that in June 2018, a police officer detained Romero for possible trespassing and that she was confrontational and resistant to the officers. Counsel also sought to introduce evidence that in May 2018, police responded to a heated and emotional argument taking place outside the Garden Grove City Hall involving Romero and a man with whom she allegedly had had a history of domestic violence. She reportedly yelled at the man and interrupted and yelled at officers who tried to intervene.

The trial court responded: "Well, you solicited that from her. She didn't just blurt it out." The court continued: "You solicited, 'You were peaceful. You never had any bad experiences with police.' [¶] And now you think you've got it . . . . [¶] . . . [¶] . . . She didn't open the door; you chose to open the door."

---

[5] Subdivision (i) of section 780 permits a trial court to admit otherwise inadmissible evidence for impeachment purposes to prove or disprove the "existence or nonexistence of any fact" about which a witness has testified or opened the door. (See *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946.) The open-the-door rule prevents witnesses from misleading the jury or minimizing the facts. (*People v. Robinson* (1997) 53 Cal.App.4th 270, 282-283.)

Driver's trial counsel argued that the evidence of Romero's prior police contacts was nevertheless admissible under sections 1103 and 780 to impeach Romero's credibility and "as an affirmative defense to show that she's—she's mutually—she's likely to be also combative with words."

The trial court observed, "But there is no evidence of it in our case. She is walking down the street. She smiles. And then bad things happen. What did she do aggressively?" The court ruled that the evidence would not be admitted: "As far as the prior police contacts, I think we have gone way off. A person, when they are testifying as a victim in a case, doesn't have their whole background come into evidence because it might have some bearing on their credibility. I don't think any of those incidents have bearing on credibility. And counsel vacillates between: Well, it's for her credibility. Well, it isn't for her credibility, but it is really for her credibility. [¶] And these are police contacts, not even finalized arrests, and I don't find them very convincing in terms of the relevancy of the victim's credibility. [¶] So I'm excluding the prior police contacts, as I did before."

In his appellate opening brief, Driver argues evidence of Romero's prior police contacts were admissible under section 780 to impeach her as well as under section 1103 to prove conduct in conformity with her character. As discussed *ante*, subdivision (i) of section 780 permits a trial court to admit evidence of prior misconduct for impeachment purposes to prove or disprove the "existence or nonexistence of any fact" about which a witness has testified or opened the door. (See *Andrews v. City and County of San Francisco, supra*, 205 Cal.App.3d at p. 946 ["[A] witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony"].)

Here, the trial court had ruled before trial that Romero's prior police contacts were not relevant to the instant case. (*People v. Contreras* (2013) 58 Cal.4th

11

123, 154 ["a determination that impeachment or other evidence should be excluded as 'collateral' inherently involves the balancing contemplated by Evidence Code section 352"].) The prosecutor did not ask Romero about her prior police contacts or whether she considered herself a peaceful person, and Romero did not volunteer such testimony. Driver does not point to any portion of Romero's direct testimony which opened the door to her opinion about her peacefulness or whether she had prior altercations involving the police.

Notwithstanding the trial court's pretrial ruling, Driver's trial counsel opened the door to this issue by eliciting Romero's opinion that she was a peaceful person who had not had bad prior experiences with the police only to seek to introduce the previously excluded evidence to impeach her. "A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted. [Citations.] This is especially so where the matter the party seeks to elicit would be inadmissible were it not for the fortuitous circumstance that the witness lied in response to the party's questions." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; see *People v. Contreras, supra*, 58 Cal.4th at p. 154 ["the defense had no right to impeach [the witness] on this collateral matter"]; *People v. Turner* (2017) 13 Cal.App.5th 397, 410, fn. 4 [same].)

In any event, regardless of whether offered under section 780 or 1103, the exclusion of the evidence of Romero's prior police contacts did not constitute an abuse of discretion under section 352. Driver did not describe his encounter with Romero as having been violent nor did he suggest she was inebriated. By his telling, all Romero did was smile at him and in response, he called her names to get rid of her which resulted in her hollering and his decision to leave the scene. Evidence showing that Romero had prior contacts with police involving a trespassing investigation and a public domestic dispute had little probative value which was substantially outweighed by the undue

12

consumption of time and prejudice that would result from its admission. We find no error.

D.

*Due Process Challenge*

Driver's constitutional challenge with regard to the exclusion of evidence of Orozco's prior bad acts and Romero's prior police contacts was entirely based on the argument the trial court erred by failing to admit such evidence pursuant to sections 1103, 780, and 352. As we found no abuse of discretion under section 352, Driver's constitutional argument based on that alleged error necessarily fails.

II.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DRIVER'S REQUEST TO REDUCE HIS FELONY CRIMINAL THREATS CONVICTION TO A MISDEMEANOR.

Driver contends the trial court abused its discretion when it declined to reduce his felony conviction for making criminal threats to a misdemeanor. We disagree.

Violation of Penal Code section 422 is a wobbler offense that may be punished as either a misdemeanor or felony. The trial court has discretion to reduce a wobbler offense that was charged as a felony to a misdemeanor. (*Id.*, § 17, subd. (b).) Driver filed a request that his felony conviction for making criminal threats be reduced to a misdemeanor under subdivision (b)(3) of Penal Code section 17, which provides: "When a crime is punishable, in the discretion of the court, either by imprisonment in the state prison or imprisonment in a county jail under the provisions of subdivision (h) of Section 1170, or by fine or imprisonment in the county jail, it is a misdemeanor for all purposes under the following circumstances: [¶] . . . [¶] (3) When the court grants probation to a defendant and at the time of granting probation, or on application of the defendant or probation officer thereafter, the court declares the offense to be a misdemeanor."

13

The following factors are relevant in the court's exercise of discretion under Penal Code section 17, subdivision (b):  "'[T]he nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, [and] his traits of character as evidenced by his behavior and demeanor at the trial.'"  (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 978 (*Alvarez*).)  "When appropriate, judges should also consider the general objectives of sentencing" which include protecting society, punishing the defendant, encouraging the defendant to lead a law-abiding life in the future, deterring the defendant from future offenses, deterring others from criminal conduct by demonstrating its consequences, preventing the defendant from committing new crimes by isolating the defendant for the period of incarceration, securing restitution for the victims of crime, and achieving uniformity in sentencing.  (*Ibid.*, fn. 5.)

On appeal, "'[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'  [Citation.]  Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree.  "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge."'"  (*Alvarez, supra*, 14 Cal.4th at pp. 977-978.)

At the sentencing hearing, the prosecutor opposed Driver's request to reduce his felony conviction for making criminal threats to a misdemeanor based on his criminal history which included nine misdemeanor convictions and the "escalating" nature of his conduct.  In 2015, Driver was charged with making criminal threats but pleaded guilty to disturbing the peace in violation of Penal Code section 415.  The prosecutor noted that "the conduct explained in the probation report was very similar to the circumstances here" and "we are back here again on two separate instances of criminal threats, and it would be appropriate for a felony at this time."

14

The following colloquy ensued:

"[Driver's trial counsel]: The other option—and I do understand the prosecution's statement[.] The other option or alternative would be to allow the client to earn a misdemeanor possibly if he can conduct himself in a manner with no new law violations or no probation violations for a given period of time, if the Court would allow him to come back and reduce the felony to a misdemeanor. That would be the other—the request that we thought of.

"The Court: Comment on that?

"[The prosecutor]: Your Honor, I believe the law does require that when probation is given in this case. So I am not opposed to that, if . . . some period of time goes by and the defendant comes back and re-petitions the Court. I believe he is eligible to do that because he is going to be given a probation sentence.

"The Court: I think that's true. That's really just the operation of law. You have [Penal Code section] 1203.4 which will dismiss a case if someone successfully completed probation. And we will put in the minutes if he successfully completes probation, the court would be inclined to reduce it to a misdemeanor."

The trial court's minutes from the sentencing hearing state that the trial court granted Driver's unopposed oral motion to reduce his felony conviction to a misdemeanor pursuant to Penal Code section 17, subdivision (b) upon Driver's successful completion of probation.

The trial court's decision to defer reducing Driver's felony conviction to a misdemeanor pending his successful completion of probation did not constitute an abuse of discretion given Driver's multiple misdemeanor convictions, Driver's conduct of making criminal threats to a stranger passing him by on the street on more than one occasion, and Driver's failure to take responsibility for his conduct coupled with his expressed contempt for his victims.

15

DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


ARONSON, ACTING P. J.


GOETHALS, J.